UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JUSTIN CASEQUIN, ANTONIO M. VEGA,
JASON EARL CANDLISH, CHRISTOPHER
J. COMER, AARON GODWIN, TYLER
SVEDBERG, CHRISTOPHER WHITE,
NICHOLAS CARNAGEY, DAVID
SCHMENK, RYAN GODWIN, THANHSON
SEAN, CRAIG FENN, CAMERON HARRIS,
RYAN BELKNAP, ANTHONY JAMES
CADOTTE, DARRANS MARGENS DESIRE,
DAVID ANDREW ROBERTS, MIKE
BOGENRIEF, GARRY DEDICK, ANDRE
CALIXTO, ERIC FREDRICKSON, BRYAN
RUSS, ANDREW OLEYKOWSKI, DILLON
GREEN, and JESSE L. PAUL,

      Plaintiffs,

v.                                                              Case No. 2:18-cv-588-JLB-MRM

CAT 5 CONTRACTING, INC., and
MATTHEW SPANTON,

      Defendants.

_____

## **O R D E R**

Plaintiff Justin Casequin is the former owner of Able Restoration LLC

("Able"), a roofing contractor. Sometime before 2015, he met Defendant Matthew

Spanton on social media. Like Mr. Casequin, Mr. Spanton was in the roofing

business; he is the owner of Defendant CAT 5 Contracting, Inc. ("CAT 5"). When

Mr. Casequin's business fell on hard times, Mr. Spanton offered him and some of his

salespeople (the other twenty-four Plaintiffs in this case who, collectively with Mr.

Casequin, will be called the "Sales Team") the opportunity to work for CAT 5 in

Florida.[1]  The Sales Team accepted the offer.  Within a year, the relationship disintegrated, and the Sales Team was fired.  The Sales Team now sues CAT 5 for breach of contract and unjust enrichment based on CAT 5's alleged failure to pay sales commissions which the Sales Team was owed.  The Sales Team also brings claims for retaliation under the Fair Labor Standards Act (FLSA)[2] and Florida Statute § 448.102(3).  Mr. Spanton and CAT 5 allegedly retaliated against the Sales Team due to its complaints about CAT 5's unlawful business practices, which were articulated in an e-mail the Sales Team sent to Mr. Spanton.  (Doc. 97.)  Defendants move for summary judgment on all claims.  (Doc. 97.)

After careful consideration, the Court denies summary judgment as to all claims for breach of contract and unjust enrichment.  However, the Court grants the motion as to all retaliation claims.

## BACKGROUND

### I.   The Sales Team agrees to work for CAT 5.

Viewing the evidence in the light most favorable to the Sales Team, the non-moving party here, the facts are as follows:  Sometime before 2015, Mr. Casequin met Mr. Spanton by sending him a message on Facebook.  (Doc. 98 at 14:23–15:4,

---

[1] It is not entirely accurate to say that all of the Plaintiffs came over with Mr. Casequin from Able.  Plaintiffs Bryan Russ and Eric Fredrickson joined CAT-5 at a later date.  (Doc. 97 at 5, ¶ 10.)  For ease of reference, however, this Order will refer to all Plaintiffs as the Sales Team because that is a broadly accurate characterization of Plaintiffs' role at CAT-5.  And that characterization is inconsequential to the legal issues before the Court.

[2] 29 U.S.C. §§ 201–19.

16:14–15.)  Both men were in the roofing business, and Mr. Casequin claims he contacted Mr. Spanton because he admired his success.  (Id. at 15:3–4.)  Their online conversation continued through 2017, when Hurricane Irma impacted Florida.  (Id. at 17:13–18:8.)  By this time, Able (which operated in Virginia and Maryland) was struggling, and Mr. Casequin was "in a lot of debt."  (Id. at 18:24–19:2.)  As Mr. Casequin admits, Mr. Spanton provided a "lifeline" by offering him and the Sales Team an opportunity to "work the Hurricane Irma storm" with CAT 5 in Florida.  (Id. at 18:6–15, 35:7–9.)

After some preliminary discussions, (Doc. 98 at 18:21–23), Mr. Spanton invited Mr. Casequin and some members of the Sales Team to meet with him at a hotel in Naples, Florida.  (Doc. 100 at 17:23–18:4.)  There, Mr. Spanton pitched the benefits of joining CAT 5, which supposedly included: (a) no sales quotas, (b) a flexible work schedule, and (c) the option for the Sales Team to stop selling whenever they wanted and simply manage their existing deals.[3]  (Doc. 99 at 42:8–14, 65:5–10.)  The "pitch" included little detail about how commissions were to be derived and paid.  (Doc. 98 at 74:20–24.)  But it is undisputed that the Sales Team

---

[3] As Plaintiff Bryan Russ explained in his deposition, when a natural disaster like Hurricane Irma strikes, "[y]ou only have so long to sell customers on that storm."  (Doc. 101 at 30:17.)  The demand for roof repair services naturally tapers off as the damage from the storm is fixed.  As a result, salespeople who are "working the storm" gradually shift their focus from selling new roofing jobs to managing the jobs they have already sold.  (Id. at 46:3–13.)  Given the cyclical nature of the roofing business, Mr. Russ believes that it makes no sense to fire a salesperson if they no longer want to sell because, at some point, the salesperson needs to shift his focus from selling roof repair services to the management of those roofing services he had already sold.  (Id. at 46:14–14.)

was to be paid on a commission basis, with percentages varying according to the salesperson and their level of seniority. (Doc. 30 at ¶¶ 8–32; Doc. 99 at 121:13–18.) It is also undisputed that a commission on a job would be distributed only once the job was finished and the client had paid. (Doc. 98 at 22:19–22; Doc. 99 at 54:3–9; Doc. 100 at 61:3–9.) Unfortunately, the understanding between CAT 5 and the Sales Team did not go much deeper; the parties never formalized their commission arrangement in any authoritative writing.[4] And there appears to have been no discussion about whether terminated salespeople would be entitled to commissions for jobs they sold before termination. (Doc. 99 at 50:9–11.)

## II. The Sales Team is terminated shortly after sending an e-mail with their grievances to Mr. Spanton.

In all events, Mr. Spanton's pitch worked; the members of the Sales Team began working for CAT 5 sometime around October 2017.[5] (Id. at 126:4–6; Doc. 100 at 28:25–29:1.) The reality of working at CAT 5, however, proved to differ greatly from Mr. Spanton's pitch. In their depositions, multiple Plaintiffs described a culture of fear and intimidation: Mr. Spanton and CAT 5's management verbally abused them, routinely dismissed their concerns, and did not uphold promises Plaintiffs believed had been made. One of the main disputes between the Sales

---

[4] In his deposition, Mr. Casequin claims that his commission plan was formalized in writing, but this writing has not been provided as part of the summary judgment record. (Doc. 98 at 22:4–9.) After not receiving a written agreement from CAT 5, Mr. Russ actually drafted his own contract based on what he understood his commission structure to be, and Mr. Casequin signed it. (Doc. 101-1 at 11.)

[5] Again, some Plaintiffs started with CAT 5 at a later date. See supra note 1. But for ease of reference, the Order will refer to the Sales Team collectively.

Team and Defendants was the amounts of commissions paid by CAT 5 to members of the Sales Team.  According to Mr. Casequin, members of the Sales Team would frequently complain that their commission checks were inaccurate, and CAT 5 would not provide them with a breakdown of how their commissions were calculated.  (Doc. 98 at 53:19–24, Doc. 101 at 21:4–22:3.)  Plaintiffs Antonio Vega and Christopher Comer testified that they were threatened with termination for requesting any breakdown of their commission payments.  (Doc. 99 at 62:5–63:1; Doc. 100 at 47:18–48:13.)

The Sales Team also claims that CAT 5 took a "stack and starve" approach to the payment of commissions.  (Doc. 30 at ¶ 63.)  This approach refers to a scheme where a contractor induces employees to sell new jobs with the promise of lucrative commissions but then delays building the jobs to avoid paying the commissions until the employees simply quit.  (Doc. 100 at 33:13–34:8; Doc. 102 at 12:17–13:1.)  Multiple members of the Sales Team testified that CAT 5 would delay ordering materials for their jobs and instead prioritized jobs from its preexisting salespeople, which delayed the Sales Team's compensation.  (Doc. 99 at 73:16–74:1; Doc 102 at 11:22–12:14.)  An important ingredient to the "stack and starve" approach is, of course, that employees must sell as much as possible.  And indeed, members of the Sales Team claim to have been repeatedly threatened with termination if they stopped selling new jobs—contrary to Mr. Spanton's alleged promise that they could stop selling whenever they wanted.  (Doc. 99 at 68:5–20; Doc. 101 at 40:16–19.)  Members of the Sales Team also claim that their commission percentages were

unilaterally altered by CAT 5, (Doc. 98 at 118:15–22; Doc. 99 at 70:2–15; Doc. 100 at 52:23–53:7), and that that they did not receive various bonuses which they were promised, (Doc. 100 at 51:4–17; Doc. 102 at 25:1–8).

As time went on, the Sales Team developed concerns not directly related to their commissions. These concerns included:

- **Occupational Safety and Health Act (OSHA)**[6]: The Sales Team claims that CAT 5's labor and installation crews were not properly harnessed while working on customers' roofs. (Doc. 98 at 123:9–124:3; Doc. 99 at 81:11–82:1; Doc. 100 at 56:20–57:20.)

- **Workers Compensation**: The Sales Team also claims that CAT 5 did not properly maintain workers compensation coverage, a problem which manifested in CAT 5: (a) forcibly converting the Sales Team from 1099 independent contractors into W-2 employees for purposes of workers compensation coverage,[7] and (b) telling members of the Sales

---

[6] 29 U.S.C. §§ 651–678.

[7] The members of the Sales Team did not become direct employees of CAT 5, but rather employees of a company called South East Personnel Leasing, Inc. ("SPLI"), which then "leased" them to CAT 5. (Doc. 128-17.) Despite this arrangement, the members of the Sales Team viewed themselves as employees of CAT 5. Moreover, a provision of the lease agreement provided that SPLI would pay the Sales Team "the applicable minimum wage (or the legally required overtime pay . . . in a workweek in which [the employee has] worked overtime)." (Id. at 4.) Whether the Sales Team was actually entitled to overtime is unclear, but this language appears to have led members of the Team to believe that they were entitled to overtime. The Sales Team further claims that they were given an ultimatum to become employees or quit and forfeit their commissions. (Doc. 98 at 82:4–25.) This was the first time that the Sales Team indisputably became aware that CAT 5 did not intend to pay commissions after termination.

Team to take down any pictures of themselves on roofs from social

media because they "weren't insured properly for that."  (Doc. 98 at

129 at 6–19; Doc. 101 at 32:15–25; Doc. 128-14.)

- **<u>Fraudulent Business Practices</u>**:  The Sales Team claims that CAT 5

  was engaging in purportedly fraudulent business practices, like robo-

  signing roof inspection affidavits and submitting invoices to clients for

  work that had not been completed.  (Doc. 98 at 127:17–129:2; Doc. 99

  at 83:6–84:15.)

These grievances (and others) were articulated in an e-mail sent by Mr. Casequin

on behalf of the Sales Team to Mr. Spanton on Friday, July 13, 2018.  (Doc. 128-16.)

After listing the Sales Team's concerns with safety, compensation, and performance,

the e-mail concluded with the following paragraph:

> If we cannot come to an agreement on these issues we will be legally
> unable to fulfill our obligations to CAT 5 and our customers.  We are
> ready willing and able to honor our obligations and expect CAT 5 to
> honor its obligations.  Alternatively, if CAT 5 does not want to address
> these issues we propose that CAT 5 pay us pursuant to the original
> agreement in October 2017, for jobs currently under construction and
> void contracts on customers where construction work has not started,
> including refunding customer money.  We will release and indemnify
> CAT 5 from responsibility relating to these customers.  In any case, we
> will not be selling future jobs for the benefit of CAT 5.

(<u>Id.</u>)  As CAT 5 acknowledges in its statement of undisputed facts, "[t]he issues

described in the E-Mail were not new issues; they had been brought up to [CAT 5]

verbally at various times before the E-Mail."  (Doc. 97 at 10, ¶ 34.)

The July 13 e-mail was the product of a group meeting that included multiple

members of the Sales Team.  (Doc. 98 at 133:12–15; Doc. 100 at 63:17–65:5.)  A

person at the meeting—who did not sign the e-mail and is not a party to this case—called a CAT 5 manager on the morning of July 13 to tell him that: (a) the Sales Team was "planning something", and (b) members of the Sales Team were selling roofing jobs for a competing contractor.  (Doc. 103 at 202:1–204:17.)  Both assertions proved to be at least partially correct; Mr. Comer admits that he was selling jobs for Island Roofing while simultaneously working for CAT 5, and the Sales Team was indeed "planning something" in the form of the July 13 e-mail.  (Doc. 100 at 72:8–15.)  The CAT 5 manager who received the tip, Armani Basurto, also claims he caught Plaintiffs Comer, Vega, and Craig Fenn in Island Roofing's offices, and that Plaintiffs Aaron Godwin and Ryan Godwin started wearing Island Roofing shirts in CAT 5's offices.  (Doc. 103 at 201:17–202:7, 258:21–23.)  Besides Mr. Comer, it is unclear how many Sales Team members were actually selling for competitors.

In any event, CAT 5 took swift action.  The e-mail from the Sales Team had been sent on a Friday.  Before the following Monday, the Sales Team lost access to their customer management software and e-mail accounts, their jobs were re-assigned to other CAT 5 employees, and the locks in their office space were changed.  (Doc. 99 at 104:5–16; Doc. 100 at 80:16–82:3.)  CAT 5's management told the Sales Team to cease communicating with customers and direct all their questions to CAT 5.  (Doc. 100 at 82:12–15.)  The Sales Team members deny that CAT 5 ever informed them of their termination; they assumed that they were fired after being locked out of their jobs.  (Doc 99 at 104:17–105:1; Doc. 100 at 82:4–15.)

### III.   The Sales Team sues Mr. Spanton and CAT 5, and CAT 5 sues the Sales Team in state court.

In late August 2018, the Sales Team commenced this action against CAT 5 and Mr. Spanton. (Doc. 1.) The operative complaint includes 127 counts. Most of these counts (1–125) are a repetitive set of theories brought by each Sales Team member against CAT 5 and Mr. Spanton: (1) retaliation under the FLSA against CAT 5; (2) retaliation under the FLSA against Mr. Spanton in his individual capacity; (3) whistleblower retaliation under Florida Statute § 448.102 against CAT 5; (4) breach of contract to recover unpaid commissions against CAT 5; and (5) unjust enrichment against CAT 5 as an alternative to the breach-of-contract claim.

The final two counts (126 and 127) are based on two state-court lawsuits that CAT 5 commenced after this action. Specifically, in September and October 2018, CAT 5 filed two lawsuits involving members of the Sales Team in the Twentieth Judicial Circuit Court in and for Collier County, Florida. In the first state-court lawsuit, CAT 5 claims that Sales Team members and affiliated business entities solicited its customers and tortiously interfered in at least one of CAT 5's contracts with a condominium association. Complaint, CAT 5 Contracting, Inc. v. Elias Brothers Grp. Painting & Contracting Inc., No. 11-2018-CA-002684-0001 (Fla. 20th Cir. Ct. Sept 7, 2018). In the second state-court lawsuit, CAT 5 claims that Sales Team members tried to siphon tarp installation work from CAT 5 to one of its competitors. Complaint, CAT 5 Contracting, Inc. v. Island Roofing & Restoration, LLC, No. 11-2018-CA-002946-0001 (Fla. 20th Cir. Ct. Oct. 2, 2018). As of this Order, both cases remain pending.

In Count 126, Plaintiffs Vega, Russ, Jason Earl Candlish, and Tyler Svedberg allege that the first state-court lawsuit—in which they were accused of conspiring to steal CAT 5's clients—is retaliation under the FLSA by Mr. Spanton and CAT 5.  In Count 127, the entire Sales Team alleges that the second state-court lawsuit is also retaliation under the FLSA because Defendants accused them of conspiring to solicit CAT 5's clients and stealing tarp installation work from CAT 5 (although CAT 5 does not do such work).

### SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In other words, summary judgment is warranted if a jury, viewing all facts and any reasonable inferences therefrom in the light most favorable to plaintiffs, could not reasonably return a verdict in plaintiffs' favor."  Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1581 (11th Cir. 1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact . . . ."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id.

## DISCUSSION

**I.    Although discovery is not yet complete, the Court will rule on the merits of Defendants' summary judgment motion.**

"Before entering summary judgment the district court must ensure that the parties have an adequate opportunity for discovery." Fla. Power & Light Co. v. Allis Chalmers Corp., 893 F.2d 1313, 1316 (11th Cir. 1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); see also Fed. R. Civ. P. 56(d) (allowing a party to show by affidavit or declaration that it cannot present essential facts to oppose summary judgment). While a district court is "not required to await" completion of discovery before granting a motion for summary judgment, such a motion "should not . . . ordinarily be granted before discovery has been completed." Allis Chalmers Corp., 893 F.2d at 1316; Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co., 606 F.2d 602, 609 (5th Cir. 1979). The party opposing summary judgment "bears the responsibility of bringing to the trial court's attention any outstanding discovery in the cause." Cowan v. J.C. Penney Co., 790 F.2d 1529, 1530 (11th Cir. 1986).

The discovery deadline in this case was previously October 14, 2020, but it has recently been extended to August 16, 2021 because the Sales Team has not yet deposed two key witnesses: Mr. Spanton and Darin Hancock. (Doc. 76 at 1; Doc. 128 at 14.) Both sides agree these witnesses are crucial. Mr. Spanton is CAT 5's owner and one of the named Defendants. Mr. Hancock was described at the last status conference on June 16, 2021 as the CAT 5 employee "who knows all of the financial information," and this knowledge is central to the Sales Team's breach-of-contract and unjust enrichment claims. Given counsels' representations at the last

status conference, the Court does not believe that the failure to depose Mr. Spanton and Mr. Hancock is attributable to dilatory conduct by any single actor.  It appears the depositions have been delayed due to a combination of logistical challenges and health issues (which may or may not be legitimate).  Both sides were orally ordered to conduct the depositions no later than July 31, 2021.

Against this backdrop, the Sales Team argues that summary judgment is premature because Mr. Spanton and Mr. Hancock have not been deposed.  (Doc. 128 at 14.)  It is the Sales Team's burden to "call[] to the district court's attention any outstanding discovery." Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1063 (11th Cir. 2015) (quoting Snook v. Tr. Co. of Ga. Bank of Savannah, N.A., 859 F.2d 865, 871 (11th Cir.1988)).  And the Sales Team must provide more than "vague assertions that additional discovery will produce needed, but unspecified, facts." Id. (quoting Reflectone, Inc. v. Farrand Optical Co., 862 F.2d 841, 843 (11th Cir. 1989)).

As to Mr. Spanton, the Sales Team provides no specific facts besides mentioning that he is CAT 5's "primary decision maker." (Doc. 128 at 14, n.4.)  This assertion is too vague to put off ruling on Defendants' motion.   The Sales Team's argument as to Mr. Hutchinson is more specific—he has the most intimate knowledge of how CAT 5's commissions are calculated and may have important testimony "with respect to liability and damages for breach of contract."  (Id.)  But, as explained below, the Court is denying summary judgment as to the breach-of-contract and unjust-enrichment claims.  Thus, the Sales Team has not

demonstrated how more discovery would change the Court's ruling on this motion, and the Court will proceed to the merits.

## II.   Contrary to CAT 5's contention, a contract exists.

In their reply, Defendants argue that the Sales Team's claims for breach of contract to recover unpaid commissions must fail because the Sales Team has failed to prove the existence of any such contract.   (Doc. 129 at 4–5); see also St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004) ("An oral contract . . . is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms." (citation omitted)).

To put it mildly, this argument is a stretch.   Florida law obviously recognizes at-will employment contracts and holds that continued employment (that is, the employer's forbearance from terminating the employee) may serve as valid consideration.   See, e.g., City of S. Miami v. Dembinsky, 423 So. 2d 988, 989 (Fla. 3d DCA 1982); Tranchant v. Ritz Carlton Hotel Co., No. 2:10-cv-233-FtM-29DNF, 2011 WL 1230734, at *4 (M.D. Fla. Mar. 31, 2011).

Here, the Sales Team unquestionably had an oral, at-will agreement with CAT 5 to sell roofing jobs in exchange for commission-based compensation.   Nobody can seriously suggest that there was no mutual agreement supporting these dealings, or that Plaintiffs were simply volunteering at CAT 5.   Indeed, if that were Defendants' only argument, they would effectively admit that there is an issue of fact which cannot be resolved on summary judgment.   See Boim v. Nat'l Data Prod., Inc., 932 F. Supp. 1402, 1405 (M.D. Fla. 1996) ("To consider Defendants' summary judgment Motion, the Court must arguendo accept the existence of the oral contract.

To do otherwise would admit to the existence of an issue of material fact, thereby precluding summary judgement.").

Accordingly, the Court declines to hold that the Sales Team has failed to establish the existence of any contract.

## III. Questions of fact remain as to the Sales Team's claims for breach of contract and unjust enrichment.

Of course, a contract's mere existence does not mean it has anything to say about post-termination commissions. The parties seem to agree that the oral contract between the Sales Team and CAT 5 did not expressly contemplate what would happen to the Sales Team's commissions if its members were terminated. Fortunately, Florida law provides a default rule: "an employee is entitled to commissions collected post-termination, provided those commissions were 'earned' during his employment." Comerford v. Sunshine Network, 710 So. 2d 197, 198 (Fla. 5th DCA 1998) (citing Cornell Comput. Corp. v. Damion, 530 So. 2d 497, 498–99 (Fla. 3d DCA 1988)); see also 30 C.J.S. Employer—Employee § 175.

There are at least three exceptions to the rule: (1) the contract expressly provides that commissions will be forfeited upon termination, (2) an employee must perform additional services as a condition of the right to a commission, and (3) there is a recognized custom in the business that the right to a commission terminates with employment. Comerford, 710 So. 2d at 198.

### A. Absent contrary evidence, the Sales Team's commissions were "earned" when its members made a sale.

Defendants first argue that they are entitled to summary judgment on some of the breach-of-contract and unjust-enrichment claims because the Sales Team's

commissions on a roofing project were not "earned" unless the project was completed, and all of the money was collected before termination.  (Doc. 97 at 16.) "[I]f a contract is silent . . . on the right of accrual, then commissions are generally deemed earned when a sale is made, although the goods or services are delivered after [an employee's] termination."  Comerford, 710 So. 2d at 198; see also Glickman v. Sears, Roebuck & Co., 129 F. App'x 526, 528 (11th Cir. 2005).  Here, multiple Sales Team members testified that CAT 5 did not actually pay commission on a project until it was completed and paid for.  (Doc. 98 at 22:19–25; Doc. 100 at 61:3– 14.)  But that does not necessarily mean that the Sales Team's right to a commission only accrued when a customer paid.  As the Sixth Circuit explained in a case involving entitlement to commissions after termination of a contract:

> A right has accrued when it is vested; i.e., when there arises a fixed, unconditional right to receive it:
>
> The word "accrued" does not signify that an item is due in the sense of being payable; the accrual system disregards the dates of payment, making the right to receive and not actual receipt decisive.

Duane Mgmt. Co. v. Prudential Ins. Co., 29 F.3d 245, 248 (6th Cir. 1994) (emphasis added) (quoting Archer v. Comm'r of Revenue of Ky., 227 S.W.2d 1001, 1002 (Ky. 1950)).  Defendants cite no record evidence—and the Court likewise finds none—to suggest that the Sales Team's right to a commission on a project did not "accrue" until the project was completed and paid for.  Absent any evidence, the default rule in Florida is that commissions are earned "when a sale is made."  Comerford, 710 So. 2d at 198; see also Abbott v. Tec-Mill & Supply, Inc., 178 So. 2d 881, 882 (Fla. 3d DCA 1965) ("Even though for convenience or by company practice salesmen's

commissions may have been paid when the contracts to which they related were fulfilled, in the absence or a contrary provision in the plaintiffs employment contract he was entitled to receive earned commissions when his employment was terminated, notwithstanding such termination of employment came before completion of the contracts solicited."); 2A C.J.S. Agency § 336 ("[A] selling agent generally earns commissions when the agent procures an order from a ready, willing, and able purchaser, and the order is received by the principal.").

Therefore, based on the record before the Court and viewing the facts in the light most favorable to Plaintiffs, the Court rejects Defendants' argument that the Sales Team's commissions were not "earned" until after the job was completed and paid for by the customer.  Florida law tells us otherwise. [8]

### B.   CAT 5 has not established a recognized business custom of not paying post-termination commissions.

Defendants next argue that even if the Sales Team's commissions were "earned" before termination, the third exception in Comerford applies because it is "[CAT 5]'s and the industry's recognized business custom that commissions are not paid post-termination."  (Doc. 97 at 16–17.)

As Comerford explains, an employee may not collect post-termination commissions earned during employment if there is "a recognized custom in the

---

[8] In its response, the Sales Team interprets Defendants' argument as invoking the second exception in Comerford, namely that payment by the customers was a condition precedent to payment of a commission.  (Doc. 128 at 17); Comerford, 710 So. 2d at 198.  Defendants do not directly invoke the second exception in their papers, but even if they did, the Court would reject their argument for reasons similar to the ones above.  There is no record evidence establishing payment by the customer as a condition precedent.

trade, business or industry that the right to be paid a commission terminates with the employment."  710 So. 2d at 198 (citing Cornell Comput. Corp., 530 So. 2d at 498–99).  "[I]n these instances, the best evidence of an industry custom is the employer's own policy."  Lincare Holdings Inc. v. Ford, 307 So. 3d 905, 911 (Fla. 2d DCA 2020).  Moreover, "where the company has an established policy communicated to its employees precluding post-termination payment of commissions, custom and practice do not control."  Comerford, 710 So. 2d at 199.  Instead, "[t]he company policy effectively becomes an implied term of the employment relationship."  Id.

To show that CAT 5 had an "established policy" of precluding post-termination commissions, Defendants cite two excerpts from the deposition testimony of Mr. Basurto.  (Doc. 97 at 6, ¶18.)  In the first excerpt, Mr. Basurto explains that CAT 5 did not pay commissions "unless a job was 100 percent completed," a proposition which the Sales Team generally agrees with.  (Doc. 103 at 42:5–14.)  But Mr. Basurto does not discuss any companywide policy regarding post-termination commissions.  In the second excerpt, the Sales Team's counsel asks Mr. Basurto what commissions (if any) should have been paid to the Sales Team members after they were fired.  (Id. at 244:20–23.)  Mr. Basurto responds, "If they were managing jobs that were not completed, in my opinion, they should get zero dollars."  (Id. at 245:11–13) (emphasis added).  The Sales Team's counsel then asks Mr. Basurto if his opinion would change depending on whether the Sales Team quit

or had been terminated.  (Id. at 245:25–246:2.)  Mr. Basurto's response led to the

following exchange:

> [MR. BASURTO:] The guideline is you're paid your commission on a
> job once you finish out the job 100 percent yourself, collect the final
> payment, turn the certificate of completion in, submit an invoice.
> That's when you're paid on the job.  So whether they quit or they got
> fired, if those steps were not done, you're not receiving your
> commission.
>
> [COUNSEL:] Is that policy in writing?
>
> [MR. BASURTO:] I don't know, to be honest.
>
> [COUNSEL:] Have you ever seen that policy in writing?
>
> [MR. BASURTO:] I can't recall.
>
>                                    . . .
>
> [COUNSEL:] It doesn't exist, right, Armani?
>
>                                    . . .
>
> [MR. BASURTO:] Does it exist?  I believe it does exist because I know
> as a sale guy early on, I signed a contract.  So it could be somewhere in
> writing.  Do I know where it's at?  No.

(Id. at 246:8–247:13) (emphasis added).  Read in the light most favorable to the

Sales Team, Mr. Basurto's testimony does not demonstrate that CAT 5 "ha[d] an

established policy communicated to its employees" regarding post-termination

commissions.  After initially testifying that CAT 5 did not owe the Sales Team

anything, Mr. Basurto characterized this statement as an "opinion."  He then

explained that he derived this "opinion" from the more general "guideline" that a job

must be fully completed before CAT 5 pays any commission on it.  When pressed

about whether any such policy existed in writing, he could not remember; he

"believe[d]" that the policy might be "somewhere in writing," but he did not know where.  These equivocal statements are not enough to support the existence of an "established policy" for purposes of summary judgment.

Defendants also rely on excerpts from the deposition testimony of Mr. Casequin.  (Doc. 97 at 6, ¶18.)  As explained earlier, CAT 5 forcibly converted the Sales Team from 1099 independent contractors into W-2 employees.  See supra at 6. During Mr. Casequin's deposition, he was asked whether the Sales Team members could have simply left CAT 5 if they did not want to become employees.  (Doc. 98 at 81:25–82:3.)  Mr. Casequin answered that if the Sales Team members had not become employees, "they would forfeit all of their commissions."  (Id. at 82:4–6.)  He knew this because CAT 5's management told him that if the Sales Team's members walked away over their reclassification, CAT 5 would withhold their commissions.  (Id. at 82:22–25.)  Defendants construe this testimony to mean that CAT 5 had a policy of not paying post-termination commissions, and this policy was communicated to the Sales Team.  The Court does not agree.

While Comerford provides that company policy may sometimes "become[] an implied term of the employment relationship," 710 So. 2d at 199, subsequent cases have clarified that statements of employer policy, even when reduced to writing in employment manuals, "do not give rise to enforceable contract rights in Florida unless they contain specific language which expresses the parties explicit mutual agreement."  Quaker Oats Co. v. Jewell, 818 So. 2d 574, 576–77 (Fla. 5th DCA

2002).[9]  Mr. Casequin did not concede that CAT 5 had a policy of not paying post-termination commissions.  Rather, he was describing one instance where the Sales Team members were forced to become W-2 employees.  As leverage, CAT 5 threatened to withhold the Sale Team members' commissions if they quit.  This threat—which was never carried out because the Sales Team ultimately acquiesced—does not contain "specific language" demonstrating a "mutual agreement" that commissions would not be paid after termination.  Thus, there is no reason for the Court to assume that CAT 5's threat became an implied term of the parties' oral agreement.  See Carlucci v. Demings, 31 So. 3d 245, 247 (Fla. 5th DCA 2010) ("[T]he . . . unilateral act of implementing an internal policy that was subject to unilateral amendment or cancellation cannot constitute a contract.").

Moreover, CAT 5 apparently did not make this threat until two or three months after the Sales Team started working.   (Doc. 99 at 44:24–45:2.)  This is yet more evidence that the threat to withhold payment of commissions post-termination should not be construed as an implied term of the underlying contract for purposes of summary judgment.  See Bryant v. Shands Teaching Hosp. & Clinics, Inc., 479 So. 2d 165, 168 (Fla. 1st DCA 1985) (declining to find that employer's personnel

---

[9] To be clear, Quaker Oats involved the question of whether an employee handbook was an enforceable implied contract separate from the parties' formal employment agreement.  The issue in this case is whether a company policy was an implied term of the employment contract.  But the Court sees little meaningful difference between asking whether company policy constitutes an "implied contract" or an "implied term of a contract."  The underlying issue is the same: when does company policy become a contractual right or duty?  In either event, some specific showing of "mutual agreement" is required.

policies gave rise to contractual right of for-cause dismissal because "no explicit personnel policies existed in July 1980, the date appellants signed their contracts of employment").

Finally, Defendants cite a letter from John Kenney, the CEO of Cotney Consulting Group, in which he opines that based on his experience in the roofing business, an employee's right to a commission customarily terminates on their last day of employment.  (Docs. 97 at 7, ¶ 20; 97-8.)  As explained in a separate order, the Court does not construe Mr. Kenney's letter to be unrebutted expert testimony. At most, the letter provides a lay opinion "based on particularized knowledge gained from . . . personal experiences."  United States v. Hill, 643 F.3d 807, 841 (11th Cir. 2011).  But Mr. Kenney is not the only layperson with an opinion on the customs of the roofing business.  Several members of the Sales Team have varying levels of experience in the industry, and their testimony suggests there is no uniform custom on post-termination commissions or even the general timing of commission payments.  (Doc. 98 at 65:15–20, 149:16–151:10; Doc. 100 at 36:14–23, 74:15–20.)

In short, the existence of an industry custom on payment of post-termination commissions is a disputed question of fact which must be established at trial. Therefore, the Court will deny Defendants' motion for summary judgment as to the Sales Team's claims for breach of contract and unjust enrichment.  See Comerford, 710 So. 2d at 198–99 (reversing the trial court's entry of summary judgment because the defendant company's general manager could not establish industry custom; he represented that it was the television industry's policy to only pay

commissions through termination but did not know of any other company's policy and could not recall whether any other terminated salesmen besides plaintiff had been paid post-termination commissions).

## IV. The Sales Team's retaliation claims do not survive summary judgment.

The FLSA makes it unlawful to retaliate against an employee because they "filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA], or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Similarly, Florida law prohibits retaliation against an employee who has "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3).

A prima facie case of both types of retaliation requires the same elements: (1) the employee must have engaged in protected activity; (2) the employee must have suffered adverse action by the employer, and (3) there is a causal connection between the two events. See Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342–43 (11th Cir. 2000) (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 208–09 (10th Cir. 1997)); Aery v. Wallace Lincoln-Mercury, LLC, 118 So. 3d 904, 916 (Fla. 4th DCA 2013) (citation omitted). Both sides agree that the third element of each claim requires proof of but-for causation. See Chaudhry v. Adventist Health Sys. Sunbelt, Inc., 305 So. 3d 809, 817 (Fla. 5th DCA 2020); Kubiak v. S.W. Cowboy, Inc., 164 F. Supp. 3d 1344, 1365 n.30 (M.D. Fla. 2016).

Where a plaintiff cannot provide direct evidence of retaliation, courts apply the McDonnell Douglas burden-shifting framework.  Raspanti v. Four Amigos Travel, Inc., 266 F. App'x 820, 822 (11th Cir. 2008); Odom v. Citigroup Glob. Markets Inc., 62 F. Supp. 3d 1330, 1334 (N.D. Fla. 2014).  Defendants argue that the Sales Team has presented no direct evidence of retaliation, and therefore McDonnell Douglas's burden-shifting framework applies.  The Sales Team argues that the record contains direct evidence of retaliation.  Accordingly, the Court must first determine whether McDonnell Douglas applies to this case.

## A.    There is no direct evidence of retaliation.

"Direct evidence is evidence, that, if believed, proves [the] existence of [retaliatory intent] without inference or presumption."  Jefferson v. Sewon Am., Inc., 891 F.3d 911, 921 (11th Cir. 2018) (internal quotation omitted) (indirectly quoting Burrell v. Bd. of Trs., 125 F.3d 1390, 1393 (11th Cir. 1997)).  "For that reason, only the most blatant remarks, whose intent could mean nothing other than to [retaliate] on the basis of some impermissible factor constitute direct evidence of [retaliation]."  Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1270 (11th Cir. 2017) (internal quotation omitted) (indirectly quoting Rojas v. Florida, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).

The Sales Team points to Mr. Basurto's deposition testimony, in which he admits that he reassigned the Sales Team's jobs to other candidates the day after receiving the July 13 e-mail.  (Doc. 103 at 244:3–19, 252:19–253:16.)  Nobody disputes that the complaints in the e-mail were, to some extent, protected under

both the FLSA and section 448.102(3).[10]  But, in context, Mr. Basurto's testimony is not blatant enough to constitute direct evidence of retaliation.  Mr. Basurto testified that he believed the July 13 e-mail was tantamount to a resignation letter—the Sales Team effectively quit because it no longer wanted to sell new jobs.  (Doc. 103 at 207:23–25.)  The Court is not prepared to construe this testimony as direct evidence of retaliation.  Therefore, the Court will apply McDonnell Douglas.

### B.   The Sales Team cannot satisfy the McDonnell Douglas burden-shifting framework.

Under the McDonnell Douglas burden-shifting framework, the Sales Team must first establish a prima facie case of retaliation.  Langston v. Lookout Mountain Cmty. Servs., 775 F. App'x 991, 1000 (11th Cir. 2019).  If it succeeds, Defendants must offer a non-retaliatory reason for their adverse action, after which the Sales Team must show that this reason is pretextual.  Id.  There is no dispute that the Sales Team has established the first two elements of a prima facie retaliation case: protected conduct (the July 13 e-mail) and adverse action (termination).  However, Defendants argue that the Sales Team cannot show causation because the July 13 e-mail was received hours after Ms. Basurto first learned that Sales Team members may be working for competing contractors.  (Doc. 103 at 201:6–23.)  According to Mr. Basurto, he received the tip that morning and decided to change the locks on the Sales Team's office space.  (Id. at 203:16–22, 207:2–7.)  He verified the tip by noon.  (Id. at 203:23–204:3.)  The e-mail is timestamped at 2:58 p.m.  (Doc. 128-16.)

---

[10] Defendants note that most of the issues in the e-mail have nothing to do with the FLSA but agree that the e-mail refers to unpaid overtime.  (Doc. 97 at 18.)

This means the process of locking the Sales Team out began before the July 13 e-mail was ever sent or received.

Crucially, the Sales Team admits that: (a) its members wanted to sell for competitors, (b) a tipster informed Mr. Basurto of this intention without telling him about the e-mail, which had not yet been sent, and (c) Mr. Basurto changed the locks to CAT 5's office space shortly afterwards.  (Doc. 128 at 5, ¶¶ 33–37.)  It nevertheless argues that it can satisfy the prima facie element of causation because Defendants likewise admit that "[t]he issues described in the E-Mail were not new issues; they had been brought up to [CAT 5] verbally at various times before the E-Mail."  (Doc. 97 at 10, ¶ 34.)  The Sales Team also argues that Defendants took other adverse actions against its members before their ultimate termination.  (Doc. 128 at 21–22.)  Thus, the Sales Team believes there is temporal proximity between its protected activity and Defendants' adverse actions.  See, e.g., Baroudi v. Sec'y, U.S. Dep't of Veterans Affs., 616 F. App'x 899, 902 (11th Cir. 2015) ("Temporal proximity between the protected activity and the adverse action can establish causation if it is 'very close.'" (citation omitted)).  The Court is not convinced.

First, the fact that the issues in the e-mail were not "new" does not mean they can be temporally linked to any adverse action.  The Sales Team members' own deposition testimony does not support this conclusion.  For example, Mr. Vega claims he orally complained about OSHA violations to CAT 5 managers, but they simply told him not to worry about it.  (Doc. 99 at 81:20–82:12.)  Mr. Comer does not remember voicing concerns about OSHA at all.  (Doc. 100 at 57:23–58:14.)

Similarly, Mr. Vega's apparent requests to be paid overtime (a right protected under the FLSA) were ignored without adverse consequences.  (Doc. 99 at 63:20–64:3.)  Thus, even if the allegations in the July 13 letter were not new, there is no evidence or testimony temporally linking them to retaliatory acts by Defendants.

Second, while the Sales Team claims it suffered a host of adverse actions before July 13, this argument does not stand up to close scrutiny.  The Sales Team alleges that it "suffered adverse employment action in the form of improper threats to withhold payment, requirements to work overtime hours without additional compensation, and unilateral changes to Plaintiffs' contractual term of employment.  The adverse employment action culminated with the termination of Plaintiffs' employment following the Email."  (Doc. 128 at 21.)  After carefully examining the record, the Court is firmly convinced these "adverse actions" were simply actions that the Sales Team believed to be inconsistent with its contract, not actions taken in retaliation for protected activity.  There is no record evidence that CAT 5 required the Sales Team members to work more overtime after they complained about not being paid overtime in the first place.  Likewise, there is no record evidence linking CAT 5's alleged threats to withhold payment of commissions or its purported unilateral changes to the contract with any protected activity under the FLSA or section 448.102(3).  These actions may have been frustrating—or even constituted a breach of contract—but the Court has no basis to conclude that they were retaliatory.

Even if the Court assumes that the tip to Mr. Basurto was an "intervening" reason (as opposed to a preceding reason) for Defendants' adverse actions, the Sales Team cannot show that Defendants' non-retaliatory reason was merely a pretext.  Compare Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011) ("Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action."), with Griffin v. City of Demorest, 635 F. App'x 701, 706 n.3 (11th Cir. 2015) (explaining that an argument based on intervening causation is "better addressed at the pretext stage . . . because it requires analysis of the employer's reason for its action").

Protecting trade secrets and preventing a potential threat from a competitor are legitimate non-retaliatory reasons.  See, e.g., Foley v. Morgan Stanley Smith Barney, LLC, No. 0:11-cv-62476, 2013 WL 795108, at *8 (S.D. Fla. Mar. 4, 2013), aff'd, 566 F. App'x 874 (11th Cir. 2014).  Because Defendants produced legitimate non-retaliatory reasons for the adverse actions, the burden shifts back to the Sales Team to show that these reasons are pretextual.   To demonstrate pretext, the Sales Team must meet the Defendants' proffered reasons "head on" and rebut them—it "cannot succeed simply by simply quarreling with the wisdom of [those] reason[s]."  Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000). Moreover, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and . . . not on reality as it exists outside of the decision maker's head."  Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1266 (11th Cir. 2010).

Here, the Sales Team does not meet Defendants' legitimate non-retaliatory reason head-on.  Instead, it quibbles with Defendants' interpretation of the underlying oral contract.  The Sales Team Members believe their agreement with CAT 5 afforded them the right to stop selling whenever they wanted and work for competitors.  (Doc. 128 at 22–24.)  Simply put, the Sales Team's arguments devolve into a disagreement about contractual interpretation.  The Court does not believe that these arguments—even if ultimately proven correct—suffice to show pretext under McDonnell Douglas.  It is not enough for the Sales Team to establish that Defendants' interpretation of the underlying contract is mistaken.  Rather, it must prove that Defendants are merely using their proffered non-retaliatory reason as cover for retaliation.  Alvarez, 610 F.3d at 1266.  "A plaintiff arguing pretext must do more than win the dispute over contractual interpretation; she must show that her opponent was concocting its story."  Reese v. Karl Schmidt Unisia, Inc., No. 107-CV-98-PPS, 2008 WL 2783259, at *8 (N.D. Ind. July 14, 2008).

The Sales Team has provided no evidence that Defendants' narrower reading of the contract was merely a cover for retaliation.  Even if the Court assumes that it is normal for roofing salespeople to stop selling when demand tapers off after a hurricane, see supra note 3, there is no indication that the parties' contract allowed the Sales Team to sell roofing jobs for a direct competitor in the same roofing market (which would imply that demand had not tapered off).  Beyond contractual interpretation, the Sales Team simply offers no argument on the issue of pretext.  At most, it argues that "the record shows no evidence or allegation" that any

member of the Sales Team actually stole confidential business or customer information from CAT 5.  (Doc. 128 at 4.)  But this point does not make Defendants' proffered reason any less facially legitimate.  The whole point of Mr. Basurto locking the Sales Team out of its office was to prevent such theft.  Accordingly, even if the Sales Team could advance beyond the prima facie stage, its retaliation claims would fail at the pretext stage.

### CONCLUSION

In final analysis, there are genuine issues of material fact that remain as to Plaintiffs' breach-of-contract and unjust-enrichment claims.  Defendants' argument that there was no enforceable contract between Plaintiffs and CAT 5 in the first instance rings hollow and treads close to frivolity.  The bottom line is that Plaintiffs rendered sales services which financially benefitted CAT 5.  And CAT 5 cannot escape Florida's default position that employees are entitled to commissions earned pre-termination.  The Court would be hard-pressed to find another case that would benefit from settlement negotiations more than this one.  With the Court's ruling on summary judgment now announced, the Court is hopeful an amicable resolution can be reached between the parties.

For the reasons above, it is **ORDERED:**

1.    Defendant's motion for summary judgment is **GRANTED IN PART and DENIED IN PART.**

2.    The Court **GRANTS** summary judgment for Defendants as to all retaliation claims (Counts 1, 2, 3, 6, 7, 8, 11, 12, 13, 16, 17, 18, 21, 22,

23, 26, 27, 28, 31, 32, 33, 36, 37, 38, 41, 42, 43, 46, 47, 48, 51, 52, 53, 56, 57, 58, 61, 62, 63, 66, 67, 68, 71, 72, 73, 76, 77, 78, 81, 82, 83, 86, 87, 88, 91, 92, 93, 96, 97, 98, 101, 102, 103, 106, 107, 108, 111, 112, 113, 116, 117, 118, 121, 122, 123, 126, 127).

3.   As to the remaining claims for breach of contract and unjust enrichment, the motion is **DENIED** (Counts 4, 5, 9, 10, 14, 15, 19, 20, 24, 25, 29, 30, 34, 35, 39, 40, 44, 45, 49, 50, 54, 55, 59, 60, 64, 65, 69, 70, 74, 75, 79, 80, 84, 85, 89, 90, 94, 95, 99, 100, 104, 105, 109, 110, 114, 115, 119, 120, 124, 125).

4.   The Clerk is **DIRECTED** to place a stay flag on this case until the parties complete discovery and the Court orders the stay flag to be removed.

**ORDERED** in Fort Myers, Florida, on August 6, 2021.

**JOHN L. BADALAMENTI**
UNITED STATES DISTRICT JUDGE